Hillsborough, }
Dec. 31, 1903. }

<h3 style="text-align:center">HEDDING *&amp; a.* *v.* GALLAGHER *&amp; a.*</h3>

A contract whereby a railroad company grants to one person the exclusive privilege of entering upon its premises for the purpose of soliciting the carriage of the baggage of passengers, and under which the traveling public is furnished with adequate service at reasonable rates, is valid.

BILL IN EQUITY, for an injunction restraining the defendants, common carriers of baggage in Manchester, from soliciting the patronage of incoming passengers at the Manchester station of the Boston & Maine Railroad and from entering for that purpose upon the station property, including the station grounds and approaches thereto, the exclusive right of such solicitation and entry having been granted to the plaintiff Hedding for a valuable consideration by the railroad, under a contract by which Hedding engaged to so perform the baggage transfer service as to fully meet the convenience and necessities of such passengers.

After the decisions in this case reported 69 N. H. 650 and 70 N. H. 631, the plaintiff Hedding amended his bill by joining the Boston & Maine Railroad as plaintiffs, and by alleging (1) that the plaintiff Hedding has performed all the duties required under the contract to the entire satisfaction of the general public having occasion to employ the services of the carriers of baggage; (2) that the entry of the defendants in disregard of the contract has been to the annoyance of the traveling public as well as of the agents and servants of the railroad; (3) that under the contract with Hardy and Hedding, to whose rights Hedding has succeeded, Hardy and Hedding were to pay a rental of $100 per year, and that the contract was tendered to the defendants and others, to be made with the parties offering and prepared to give the best service, and that Hardy and Hedding were best prepared and offered to furnish the

best service, and in the judgment of the railroad were the parties who would most probably furnish the best service; (4) that the service of transferring baggage is better performed under the obligations of such a contract because of the inducement it furnished for the maintenance of a suitable equipment, and that when this service is left to be done indiscriminately by baggagemen it is done in an unsatisfactory and inadequate manner; (5) that it is impossible, from the necessary location and construction of the station, for the railroad to furnish all common carriers of baggage with such room for standing their teams and wagons upon the grounds for the purpose of handling baggage as it furnishes Hedding, and that space cannot be furnished elsewhere about said station for the defendants and others engaged in the carrying of baggage, without interfering with the comfort and convenience of the traveling public; (6) that by no system of regulation can the railroad secure for the traveling public as good means and facilities for transferring their baggage on its arrival at the station as are furnished by Hedding under the contract; (7) that the railroad's title to the premises was secured by purchase.

The defendants' general demurrer was sustained by *Peaslee, J.,* at the September term, 1901, of the superior court, and the plaintiffs excepted.

*Oliver E. Branch,* for the plaintiffs.

*James A. Broderick,* for the defendants.

WALKER, J. The Boston & Maine Railroad, having been joined as a plaintiff by amendment, claims that by virtue of its ownership of the station at Manchester, subject to the rights of the public to use it for the purposes of transportation, it is entitled to exclude the defendants therefrom, who come there merely for the purpose of soliciting from its passengers the carriage of their baggage to points within the city of Manchester. The defendants contend that whatever the railroad's rights of ownership may be, it cannot deny them the privilege of entering the station grounds and building for the prosecution of their business, because it has expressly granted that privilege to Hedding; that it has no right to authorize or employ one job-teamster to solicit the carriage of baggage in its station and to exclude all other job-teamsters from its grounds; in short, that it cannot discriminate between carriers of that class, who seek the opportunity of soliciting from passengers alighting from the cars the privilege of transporting their trunks and parcels from the station to other parts of the city. It is not claimed in behalf of the defendants that they have any legisla-

tive or contractual right to occupy the station and its approaches; but the right is said to arise from the discriminating feature of the railroad's contract with Hedding.

In reply to this position, the railroad argues that if the alleged discrimination against the defendants did not violate any of their antecedent and subsisting rights, with reference to their occupation of the station, the discrimination was not illegal and the contract with Hedding is immaterial, so far as its right to prosecute this suit is concerned; that the fundamental question relates to the rights of job-teamsters to solicit business on the premises of the railroad, after notice to desist; that if they had that right, the contract with Hedding did not deprive them of it and they could not be enjoined from exercising it, and if they did not have it, the contract did not give it to them, because the discrimination was not illegal as against them.

Upon this summary of the respective contentions of the parties, the question is presented whether truckmen have at common law or by statute the right to enter upon and occupy a railway terminal station for the purpose of soliciting business. If they have that right, the railroad cannot exclude all, or all but one of them, from its station; if they do not have it, the further question arises whether they can acquire it under, or because of, a special license granted to one of their number. The last question has been answered in the affirmative upon a former transfer of this case, before the railroad became a party (69 N. H. 650); and while the present plaintiffs may not be entitled as a matter of right to a rehearing of the question, and while the railroad, though made a party plaintiff, according to a more or less uniform practice might be bound by the former decision (*Amoskeag Mfg. Co.* v. *Head*, 59 N. H. 332, 337; *Weare* v. *Deering*, 60 N. H. 56), the importance of the controverted points and of a correct ascertainment of the respective rights of the parties, after prolonged litigation, seem to justify, if they do not require, a further consideration of the case upon its present transfer. And while little, if any, doubt could be entertained that the demurrer should be overruled upon the allegations of the recent amendment of the bill, to the effect that the presence of the defendants in the station obstructs and, interferes with the public business of transportation, the practical value of such a decision would be so small that, in view of the fact that the case has been pending for a long time and has been argued by counsel upon the broader and more fundamental question of the legal rights of the parties, both under the contract and independent of the contract, it is deemed expedient to base the decision upon a consideration of the latter question.

"It shall be the duty of the proprietors of every railroad to pro-

vide suitable crossings, stations, and other facilities for the accommodation of the public." P. S., *c.* 159, *s.* 1. "The proprietors of every railroad shall furnish to all persons reasonable and equal terms, facilities, and accommodations for the transportation of persons and property over their railroad, and for the use of depots, buildings, and grounds in connection with such transportation, and for the interchange of such traffic at points of connection with other railroads." P. S., *c.* 160, *s.* 1. The corporate duties thus declared by the legislature, and subject to which the corporation holds its real estate, it owes to the public having occasion to employ its facilities for the transportation of themselves or their property. It is obliged to provide reasonable accommodations at its station in Manchester for the use of the traveling public who are brought together at that point. But it owes this public duty, not to all persons indiscriminately, but to those only who stand in some contractual relation with it as passengers. A trespasser in its station could not complain that it did not furnish suitable and reasonable means for the accommodation of its patrons ; for to him it does not owe the duty of funishing facilities for transportation. *Harris* v. *Stevens*, 31 Vt. 79. If it is conceded that it is the duty of the railroad to furnish arriving passengers with reasonable means and opportunities for removing their baggage from the station, and that such means and opportunities include the presence at the station of soliciting agents for the carriage of baggage, it would not follow that it owed the defendants the duty of affording them adequate facilities for the solicitation of business from the passengers. It cannot be assumed that the passengers' convenience under their contract of carriage over the railroad requires the presence of the defendants as independent carriers · at the station on the arrival of trains. The railroad may furnish or permit adequate means for the convenience of its passengers in this respect, without the voluntary assistance of the defendants. If it is its duty to have men present on the arrrival of its trains, ready when requested to remove the baggage of passengers from its premises, no substantial reason is suggested why it may not perform that duty through such agents as it sees fit to employ, or why it should be obliged to submit to the irresponsible interference of unemployed third parties in doing the work required of it.

Nor is it apparent how the railroad's duty to its passengers in this respect gives rise to a right in all local job-teamsters to perform that duty or any part of it. The right of its passengers to have men present to solicit the carriage of baggage, or to receive such solicitation from them upon the arrival of trains, if it exists at all, does not require the presence of independent local truckmen. Whether the soliciting agents are independent local truck-

men, or whether they are men specially permitted by the railroad
to perform that service in its station, is an unimportant detail in
the reasonable performance of the public duty to passengers of
providing adequate facilities for the transfer of baggage. "So
long as the public are served to their reasonable satisfaction, it is
a matter of no importance who serves them." *Express Cases*, 117
U. S. 1, 24; *Chicago etc. R. R.* v. *Car Co.*, 139 U. S. 79, 89.
Hence the railroad's duty to its passengers does not include a duty
or obligation to permit all local carriers of baggage to solicit busi-
ness in its station. The right claimed by the defendants to enter
and remain upon the station grounds cannot be established by that
method of reasoning.

Nor do the defendants, if regarded as common carriers, owe a
duty to the incoming passengers to meet them in the station and
solicit their patronage. Hence it follows, that when they do enter
the station and solicit business they are acting in a private capacity,
and not in the performance of any public duty, either to the pas-
sengers, the railroad, or any one else. If they are common car-
riers when driving about the streets, they are not common car-
riers performing a public duty when they enter the station to solicit
the carriage of baggage. Probably solicitation is no part of a
common carrier's business anywhere; nor is it a part of the public
duty of a local job-teamster to be at any particular place to receive
parcels for carriage. Hence no duty, in the absence of contract,
rests upon the defendants to be present at the station on the arri-
val of trains. As public policy does not require their presence
there, and as the obligation of the railroad to the public can be
performed as well, and perhaps better, when they are not present,
no substantial reason remains for the claim that the railroad is
bound to furnish job-teamsters facilities for carrying on their busi-
ness in its stations. To say that when the ordinary job-teamster
happens to go into a railroad station and to ask a passenger for the
privilege of carrying his trunk to the hotel, he is in the perform-
ance of an important public function as a common carrier of bag-
gage, or that the railroad is under an imperative obligation to the
public, the passenger, or the teamster, to permit such solicitation
in its station, is the assertion of a principle founded upon the radi-
cally erroneous assumption, that the property of a railroad may be
used by others, without compensation and against the protest of
the corporation, for the prosecution of their private business.

But it is said that the defendants, being common carriers of
baggage in Manchester, are entitled to enter the railroad station
to solicit business, because the railroad has set apart or devoted
that real estate to the business of the transfer of baggage to other
connecting lines of public travel. But this right, if it exists, is

not an original right vested in the defendants by any act of the
legislature or by the common law.    The legislature has not
required railroad corporations to furnish all common carriers of
baggage, who happen to approach one of its terminal stations,
with the means of most conveniently and expeditiously obtaining
contracts from its passengers for the carriage of their parcels.
The right to the reasonable use of the terminal facilities of one
railroad by a connecting railroad does not exist except by legisla-
tive grant or by contract.    Without such permission, one corpora-
tion cannot enter upon, and use, the land of another.    "Every
railroad corporation shall, at reasonable times and for reasonable
compensation, draw over its railroad the cars, passengers, and
freight delivered to it by any other corporation whose railroad
connects with its railroad, and which is authorized to enter on and
use the same, or which is authorized to use the railroad of any
corporation having such authority, and the cars, passengers, and
freight destined for such connecting railroad, and it shall provide
convenient and suitable depot accommodations for such passen-
gers and freight."    P. S., c. 157, s. 10.    Special legislative provi-
sions upon this subject have been deemed necessary in substan-
tially all railroad charters granted in this state, which, recognizing
the right of private ownership of railroad property, establish an
equitable basis of compensation for the imposed use.    "The com-
mon-law obligations of a railroad company to a connecting line are
the same, as to reception, transportation, and delivery of freight,
as those existing between the railroad company and an individual
shipper.    Whatever rights or privileges, other than those belong-
ing to a natural person, that are claimed by one railroad company
against a connecting company, must be found either in the char-
ters of the companies, or arise from contract."    *Shelbyville R. R.
v. Railroad*, 82 Ky. 541, 545 ;  *Atchison etc. R. R.* v. *Railroad*, 110
U. S. 667 ;  *Concord etc. R. R.* v. *Railroad*, 68 N. H. 519.

Having no express authority for the use they make of the rail-
road's station, the defendants had no right to such use before the
contract with Hedding, in the absence of a revocable license,
unless it can be based upon, or derived from, the right of pas-
sengers to reasonable accommodations for the removal of their
baggage from the station.    But if that duty is fully and satis-
factorily performed by the railroad,—if its patrons receive reason-
able, prompt, and adequate service,—the presence of the defend-
ants at the point where they alight from the cars is unnecessary,
and may be objectionable.    If it is the public duty of the railroad
to afford adequate facilities for the transfer and removal of
baggage, and if that duty is performed to the satisfaction of its
patrons, it is difficult to understand how local truckmen acquired

the right, or how a duty rests upon them, to be present for the performance of that service, except so far as they have been permitted by the railroad to enter its premises; that is, except so far as the right exists under a revocable license from the railroad.

When it is said that the station has been devoted to the business of the transfer of baggage, so that all truckmen have an absolute right to prosecute their business at that point, the error in the argument is that it disregards the duty of the railroad to the traveling public, to whose convenience it has devoted its station, and assumes that its license to truckmen to assemble there has become irrevocable. But it is elementary that a mere license to enter upon land is not by lapse of time changed into an absolute right of entry. "If it be insisted, that by opening the doors of their depots the company give an implied license to any and all persons to enter, it may be answered, that by thus opening their doors they do, *prima facie*, give an implied license to all persons to enter, and no person is a trespasser by merely entering therein. But all such licenses are in their nature revocable; and if actually revoked, and due notice given to an individual or class of individuals, and they still persist in entering, it is without a license, and the owner has a right to exclude them by force, if necessary, using no more force than is necessary for that purpose." *Commonwealth* v. *Power*, 7 Met. 596, 602; *Harris* v. *Stevens*, 31 Vt. 79.

And it can make no difference that in this case the defendants are styled common carriers; for unless the convenience of the traveling public requires their presence in the railroad's station, they are in the same legal position with reference to the railroad that a private individual occupies under the same circumstances. It is not intended to decide that it is not the legal duty of the railroad to permit local truckmen to occupy its station for the purpose of soliciting business from its passengers, when the convenience of the latter may require the presence of the former; but it is sufficient for the purposes of the present argument to hold that when the traveling public are reasonably and satisfactorily served in the matter of the transfer of their baggage, there is no occasion for the presence of an additional force of men who are ready for hire to serve the public as common carriers of parcels. If there is no occasion for such additional service, the teamster's right to render it on the railroad's premises cannot be derived from the railroad's general duty to its passengers. The conclusion seems to be inevitable on principle, that any right the defendants had, before the contract with Hedding, to enter the station at Manchester in pursuit of employment, in the absence of any public necessity therefor, was derived from a revocable license

granted by the railroad as the owner of the real estate used for the purposes of a station; and that on the revocation of the license the defendants' right ceased.

It is to be noted, that it is alleged in the bill that Hedding, in his permissive use of the railroad's property, fully meets the convenience of incoming passengers with reference to the removal of their baggage. This is equivalent to saying that the traveling public have no reasonable ground for complaint that the railroad has not provided, or does not permit, all such facilities for transportation as its duty to the public requires. If a passenger desires his baggage carried to his home, or to a particular hotel, or to any other place in Manchester, Hedding, by an arrangement with the railroad, is present with the necessary teams and men to promptly and carefully perform the service for a reasonable compensation. If the service is satisfactorily performed, it is immaterial to the passenger who does it, unless he sees fit to employ his own servant or agent. But if Hedding should solicit the carriage of baggage to one hotel alone, when there were several, it might consistently be held that the railroad did not furnish or permit such reasonable, full, and adequate facilities for transportation at its terminal as the convenience of its patrons demanded. It is not difficult to suggest supposable cases of monopolistic interference with the reasonable rights and expectations of passengers upon their arrival at a railroad station, resulting from the exclusion therefrom of all but one particular truckman or cabman. Such inconvenience suffered by passengers might have a strong tendency to prove that the traveling public were not properly served, in consequence of the discriminating license granted to a single individual. But no progress is made in the discussion of this case by the multiplication of instances of apparent injustice to passengers that might follow from the grant of exclusive privileges in a railway station, because the fact is admitted by the demurrer that Hedding fully meets all the reasonable requirements of incoming passengers in the removal of their baggage, in accordance with the express terms of his agreement. The railroad requires him to accommodate the public in all respects within the sphere of his business at the station,—not to infringe upon the rights of its patrons and inconvenience them in obtaining reasonable accommodations. Whether, upon a trial, this fact can be proved, and what evidence would be competent, sufficient, or conclusive upon that issue, are questions which may arise hereafter, but which are not now pertinent.

But it is said that the defendants' right of entry and occupation arose when the railroad attempted to grant the exclusive privilege to Hedding to solicit business in its station. It is admitted that

for many purposes the railroad has the same rights of ownership in its station building that private persons have in their real estate; but it is asserted that "a common carrier, who owes the duty to furnish to passengers for Manchester reasonable and equal facilities at the station there, is bound to accord equal facilities to all who come to that station for the purpose of carrying passengers or baggage beyond its line of road. The rights of the traveling public being involved, all that the road can do is to make reasonable regulations as to how these rights shall be furthered by baggage-carriers. It cannot discriminate between them." *Hedding* v. *Gallagher*, 69 N. H. 650, 661. It is not apparent how the duty of the railroad to furnish equal and reasonable facilities to its passengers for the removal of baggage originates a duty on its part to local truckmen to permit them indiscriminately to occupy its station for the solicitation of the carriage of baggage. The equality of service which the law requires is an equality between persons having contractual relations with the railroad relating to transportation; and if it furnishes the traveling public that equality in a reasonable and satisfactory manner, it is difficult to understand upon what principle its employment of one set of men to serve its patrons equally and properly gives rise to a right in another set of men to occupy its station for the performance of the same service. If the defendants had no absolute right to occupy the station before the discriminating contract was made, if the traveling public had no right to demand that they should be allowed that privilege, and if, as is admitted by the demurrer, Hedding under the contract furnishes adequate and reasonable facilities to the traveling public for the removal of their baggage, it would seem that the defendants' claim could only be justified by express legislation, which does not exist. The discriminating character of the contract deprived them of no essential right they possessed before, and it did not deprive the traveling public of that reasonable and equal service to which they are entitled.

Whether the contract is illegal, upon grounds of public policy, depends upon the question whether the discrimination is unreasonable as against the traveling public. P. S., c. 160, ss. 1–3; *McDuffee* v. *Railroad*, 52 N. H. 430, 457; *State* v. *Railroad*, 59 N. H. 85; *Concord etc. R. R.* v. *Forsaith*, 59 N. H. 122. All discriminating contracts are not illegal. Indeed, it would probably be difficult to draw a contract that might not, in some sense, be said to be discriminating. When A employs B to work for him, he discriminates against C whom he has refused to employ; but as none of C's legal rights are infringed by the employment of B, the discrimination is valid. It is only when the discriminating contract is in-

tended to deprive others or the public of legal rights that it is illegal. Discrimination between two parties, neither of whom has a right founded upon a public duty of the principal, is as permissible to a railroad as to an individual, and is one of the essential and inherent characteristics of the ownership of property. A railroad corporation holds its property with the same rights of proprietorship that an individual does, subject however to certain public uses. It has by virtue of its ownership the individual's right of discrimination in the enjoyment of its property, except so far as the claimed right is inconsistent with, or prejudicial to, the public right of user. If by a private contract it gives one an exclusive privilege, the question is: does the discrimination interfere with, or curtail, a public right, or is it violative of any corporate duty to the public who seek to use the railroad as a means of transportation? If it has that effect, it is in that respect unenforceable; otherwise, it is legal.

If this incident of ownership is exercised to the prejudice of the rights of the traveling public, as by providing inadequate or otherwise unsatisfactory service, or by demanding unreasonable rates for the service, the law furnishes a substantial remedy. But it is unnecessary in this case to define the limits of such remedial power, since the rights of the traveling public have not been abridged or infringed. In view of the conceded fact that under the contract the traveling public has received adequate and reasonable service, and that the discrimination complained of promotes the convenience of arriving passengers, the rights of nobody are infringed, and the discrimination is legal. *Manchester etc. R. R.* v. *Railroad*, 66 N. H. 100, 127.

It is argued, however, that because it is provided in the contract that Hedding shall pay the railroad one hundred dollars a year for the exclusive privilege of soliciting the carriage of baggage in the station, a monopoly is thus established which might operate to the disadvantage of passengers by increasing the rates they are obliged to pay for the service rendered. To this argument it is a sufficient answer to say (1) that the case discloses no facts from which it logically follows that the rates are increased, and (2) the contract expressly provides that they shall be reasonable; that is, for reasonable service, reasonable rates only shall be exacted, and this provision of the contract has been fully observed. "While, without doubt, contracts which have a direct tendency to prevent a healthy competition are detrimental to the public and consequently against public policy, it is equally free from doubt that when such contracts prevent an unhealthy competition, and yet furnish the public with adequate facilities at fixed and reasonable rates, they are beneficial and in accord with sound principles of public policy."

*Manchester etc. R. R.* v. *Railroad*, 66 N. H. 100, 127. "It is the unreasonable and injurious character of the act that is made unlawful." *State* v. *Railroad*, 59 N. H. 85, 87.

The right of patrons of the road to employ servants to go upon the grounds of the railroad, either to carry their baggage to or remove it from the station, cannot be denied in view of the public duty of the railroad to its passengers; but it is fallacious to argue from this admitted legal principle, that unemployed teamsters have an equal right to enter the station for the purpose of seeking employment. The implied right of a passenger under his contract of carriage to employ a servant or agent to carry his trunk to the baggage room, and to meet him at the station to receive his baggage on his return, is not, it would seem, analagous to the supposed right of an unemployed individual to enter the station for the purpose of seeking employment as a baggage-expressman. The latter cannot justify his entry under any contractual relation with the railroad entered into by himself, or under a contract of agency or employment by any passenger arriving at the station. He is not employed by any one to be at the station; he has not agreed to be there; he is there, not in the performance of any contractual duty, but in the pursuit of an opportunity to make a contract. Among the reasonable conveniences the railroad is bound to accord to its passengers, is the removal of their baggage when delivered to them within the station, by such agents as they may employ (*Tobin* v. *Railroad*, 59 Me. 183); but this evidently does not include the duty to permit strangers to solicit, in its station, contracts of employment from its passengers. The duty of the corporation to its passengers in this respect does not establish the right claimed in third parties.

In a specific instance, the question is whether A, who is not employed by the railroad or by any of its patrons, and who is not seeking to use the means furnished by the railroad for the transportation of himself or his property, has the same right to occupy the station grounds that B has, who is especially permitted by the railroad to be there for the accommodation of the passengers and fully meets all their wants in respect to their baggage. If the public are fully accommodated, what consideration of public policy, or what principle of law, gives rise to a right in A to occupy the property of the railroad? B is not there in the capacity of a patron of the road, and A does not claim to justify his presence as a patron of the road. As it is clear that the road does not owe the duty of furnishing equal facilities for transportation to people who are not seeking to avail themselves of such facilities, it follows that neither A nor B, when seeking employment,—not transportation,—can base his right upon the principle of equality. To rec-

ognize such a right would lead to most absurd results. B is there as a licensee of the road for the benefit of its patrons, and incidentally for the benefit of the road itself and his own advantage; while A is present, not by virtue of any license or authority from the road or its patrons, but in a purely private capacity and for his own benefit alone.

If it is assumed that the defendants are in a legal sense common carriers of parcels in Manchester, as they are alleged to be in the bill, and that consequently they are under certain obligations to the public, the conclusion does not follow that they have an independent right as carriers to appropriate the property of the railroad for the purpose of serving the traveling public, who already receive ample service from other agencies. They cannot justify their entry upon the railroad's grounds by proving that it occasions no inconvenience to the passengers or the employees of the railroad; for the corporation does not hold its property subject to the use of other and connecting common carriers, when the public are fully served without such use. Whether under such circumstances it would be reasonable if they had a right to be present, and whether that burden ought to be imposed upon the railroad, are questions of the legislative control of corporations, upon which the lawmaking body has not seen fit to take action. *Atchison etc. R. R.* v. *Railroad,* 110 U. S. 667, 682. The railroad is under no statutory or common-law obligation, as the owner of its station, to gratuitously permit other unemployed common carriers to use it as a place for soliciting business, merely because such use might seem to others to be reasonable. The doctrine of reasonableness in the owner's use of his property (*Franklin* v. *Durgee,* 71 N. H. 186; *Horan* v. *Byrnes, ante, p.* 93) has not gone to the extent of holding that he must suffer such occupation of his premises by others as is not inconvenient to him and does not interfere with his practical enjoyment thereof.

Nor is the suggestion sound, that because a truckman who is specially employed by a passenger to transport his trunk has a right to enter the station for that purpose, all common carriers seeking the carriage of trunks have a similar right of entry derived from the public whom they are desirous of serving. In the former case the truckman represents the passenger, and is his servant or agent when he occupies the station, while in the latter case the carriers of trunks do not represent, and are not the servants or agents of the traveling public before their employment, but are merely private individuals from whom a traveler may require transportation service; and until such service is required, they have no duties to perform to the public and are invested with no rights as against the railroad.

The case of *Markham* v. *Brown*, 8 N. H. 523, is claimed to be an authority for the defendants' contention. There the question related to the right of a stage-driver to enter the plaintiff's inn to solicit business from travelers who while there were guests. This was a right, as Judge *Parker* says, " derived from the right of the traveler " while a guest in the inn. The right of a guest to receive callers, while being entertained in a hotel, is quite different from the right of a passenger, when alighting from a train, to be importuned by a crowd of unnecessary job-teamsters. The hotel is the guest's temporary resting-place or home, where he has to some extent the same right to receive callers seeking business relations with him, who conduct themselves with propriety, as he has to receive them at his permanent home ; and this right of the guest includes or gives rise to the right of others to visit him while in the hotel. But because this is so, it by no means follows that every job-teamster has a right derived from the general transportation right of passengers to meet them at the station for the purpose of soliciting the carriage of their trunks. See *Old. Colony R. R.* v. *Tripp*, 147 Mass. 35, 37, 38. A further distinction is permissible between that case and this one, in that it did not appear that the convenience and comfort of the guests in the hotel would be promoted by the exclusion of all stage-drivers but one, or that the duties of the innkeeper to his guests required such a regulation. Neither the private interests of the landlord nor the comfort of his guests would suffer by the temporary presence of stage-coach drivers in the inn, and a regulation excluding them from the inn might be unreasonable. This distinction is suggested in *State* v. *Steele*, 106 N. C. 766. It was there held, that where an innkeeper made a regulation that "no livery-man or agent of any transportation or baggage company . . . . will be allowed in the hotel," and gave notice to the agent of a livery stable, who had been in the habit of soliciting custom at his hotel, not to come upon the hotel premises again, the innkeeper had a right to expel him without using unnecessary force, if he entered the hotel after such notice and engaged in soliciting custom, although at the time the hotel-keeper had made an arrangement with another keeper of a livery stable, by which the former should receive ten per cent of the proceeds of the business derived from the guests of the hotel. Referring to *Markham* v. *Brown*, the court say (*p.* 785): " There was no evidence in *Markham* v. *Brown* that the proprietor of the hotel had any contract with another stage line, or would suffer pecuniary loss or injury if the agent who was expelled were successful in his solicitations, and it seems that Angell and others, who cite as authority that case as well as *Jencks* v. *Coleman* [2 Sumn. 221] and *Barney* v. *Steamboat Co.* [67 N. Y. 301], reconcile them by

drawing the distinction that in the latter cases . . . the person whose expulsion was justified was doing an injury to the proprietor who had him removed, by diminishing his profits derived legitimately from a business used as an adjunct to that of common carrier or innkeeper." Other distinctions between the legal rights and duties of innkeepers and the proprietors of railroad stations, material to the present inquiry, have been urged in argument; but those above suggested are sufficient to show that *Markham* v. *Brown* is not an authority of much weight in this case, and that its citation is misleading.

An examination of other cases cited in support of the defendants' claim shows that they are not directly in point, and therefore can have little weight as authorities in this case. *Kalamazoo Hack & Bus Co.* v. *Sootsma*, 84 Mich. 194, holds that a railroad company cannot give to one hack company the right to the use and occupancy of a portion of its station grounds to the exclusion of others engaged in the like business of the carriage of passengers to and from its station. Little, if any, further information is derived from a reading of the opinion. It does not seem to be based upon an accurate understanding of what is meant by the railroad's duty to treat all alike. It apparently assumes that the railroad owes a duty to hackmen to allow them to occupy its premises, independent of its duty to passengers. Moreover, it did not appear that the exclusive privilege granted was for the convenience of passengers, and the case only decides that the railroad "cannot arbitrarily admit one common carrier of passengers and freight to its depot or grounds and exclude all others, for no other reason than that it is for its own profit or pleasure." But it would seem that if the discrimination had been for the benefit of the passengers, as it is in this case, the court would have reached an opposite result. In the subsequent case of *Cole* v. *Rowen*, 88 Mich. 219, it was held that a rule excluding certain hackmen from stands assigned to others, which was made to promote the public convenience, was reasonable and enforceable. *Indianapolis etc. Co.* v. *Dohn*, 153 Ind. 10, is perhaps more unsatisfactory in its reasoning than *Kalamazoo Hack & Bus Co.* v. *Sootsma*, and is open to the same criticism.

*Cravens* v. *Rodgers*, 101 Mo. 247, contains no discussion of the rights and duties of railroads and hackmen, nor did it appear that the public were fully accommodated under the discriminating contract. The decision is the result of an assumption that passengers receive the best service when there is no discrimination with reference to the presence of hackmen.

In *Montana etc. Co.* v. *Langlois*, 9 Mont. 419, the court (*p.* 429) define the subject-matter of the suit as "the grant of a special privilege to Lavell Brothers to use the specified portion of plain-

tiff's platform at said station, and the exclusion of all others from approaching thereto to land or receive passengers." "If," the court continue, in stating the plaintiff's position, a passenger " contracts with another than Lavell Brothers . . . to bring him there and be there to receive him on his return, he must alight from his carriage or be received by it fifty feet away from said platform." In other words, the discrimination authorized by the contract in that case was a discrimination affecting the comfort and convenience of passengers, and it was held to be a violation of the plaintiff's public duty to treat all passengers with substantial uniformity. *McConnell* v. *Pedigo*, 92 Ky. 465, is explainable upon the same ground.

The cases of *New England Express Co.* v. *Railroad*, 57 Me. 188, and *McDuffee* v. *Railroad*, 52 N. H. 430, relate to discriminating contracts affecting rival express companies. The question determined in those cases was entirely different from the one presented here. The express companies were regarded as individuals who were seeking contractual relations with the railroads for the carriage of parcels. They were not attempting to use the property of the railroad for their own purposes, independent of a contract for the carriage of themselves and their property. The question whether express companies are to be treated as individuals having property for carriage, and so entitled to demand the services of railroads as common carriers, or whether they are merely agencies by which the public may be served, and so not entitled to railroad accommodations when the railroad provides other adequate means for the same service (*Express Cases*, 117 U. S. 1), does not require discussion at this time. It is sufficient for present purposes that these cases do not sustain the proposition, that if the railroad allows one man to do a private business in its station it must not exclude others who desire the same privilege; on the contrary, they authorize the statement that the railroad's public duty of equal treatment relates only to persons or corporations having business relations with it in the matter of railroad transportation, and not to strangers in the prosecution of their private affairs. General or broad statements of the public duty of common carriers to avoid discrimination in their service of the public are necessarily limited, or qualified by, the special facts of the case in view of which they are made. Serious misapprehension of the scope and effect of a judicial opinion is often likely to occur, if the exact point in issue is disregarded.

On the other hand, there are numerous cases holding that a railroad may give to one hackman or one truckman the exclusive privilege to come upon its grounds for the purpose of soliciting business from passengers arriving upon its trains, provided the

service thus afforded is adequate and reasonable. In *Old Colony R. R.* v. *Tripp*, 147 Mass. 35, 37, in sustaining the plaintiff's claim the court say: " The defendant was allowed to use the depot for any business that he had with the plaintiff. But he had no business to transact with the plaintiff. He had no merchandise or baggage to deliver to the plaintiff, or to receive from it. His purpose was to use the depot as a place for soliciting contracts with incoming passengers for the transportation of their baggage. The railroad company may be under obligation to the passenger to see that he has reasonable facilities for procuring transportation for himself and his baggage from the station where his transit ends. What conveniences shall be furnished to passengers within the station for that purpose is a matter wholly between them and the company. The defendant is a stranger both to the plaintiff and to its passengers, and can claim no rights against the plaintiff to the use of its station, either in his own right or in the right of passengers. The fact that he is willing to assume relations with any passenger which will give him relations with the plaintiff involving the right to use the depot, does not establish such relations or such right; and the right of passengers to be solicited by drivers of hacks and job-wagons is not such as to give to all such drivers a right to occupy the platforms and depots of railroads." The court consider the claim, which is urged in this case, that the railroad having given the right or privilege to one hackman to occupy its platform could not refuse to allow other hackmen to exercise the same right or privilege, and dispose of it in this language ( *p.* 38): " The statute, in providing that a railroad corporation shall give to all persons equal facilities for the use of its depots, obviously means a use of right. It does not intend to prescribe who shall have the use of the depot, but to provide that all who have the right to use it shall be furnished by the railroad company with equal conveniences. The statute applies only to relations between railroads as common carriers and their patrons. It does not enact that a license given by a railroad company to a stranger shall be a license to all the world. . . . The fact that the defendant, as the owner of a job-wagon, is a common carrier, gives him no special right under the statute; it only shows that it is possible for him to perform for passengers the service which he wishes to solicit of them." If the fact that three of the seven judges sitting in the case dissented, weakened the authority of the decision, that criticism is not now important, since the opinion and ruling of the court has been approved and followed in at least two other cases arising in that jurisdiction. *Boston & Albany R. R.* v. *Brown*, 177 Mass. 65, and *Boston & Maine R. R.* v. *Sullivan*, 177 Mass. 230, make it certain that the law of Massachusetts upon this

subject is not doubtful or obscure.  Corporate duty to one class of persons for one purpose is not there converted, by a resort to general and inexact expressions of equality, into corporate duty to another class of persons for another purpose.

In *Griswold* v. *Webb*, 16 R. I. 649, it was held that a common carrier owning or controlling its terminals may exclude from them persons soliciting trade, or hacking, or expressing, without its license, but that it cannot deprive a passenger of the privilege of being carried from the terminus in a convenient and usual way, nor can it compel a passenger to take certain carriages or none. *New York etc. R. R.* v. *Bork*, 23 R. I. 218, was an action of trespass by the railroad against a hackman claiming a right to occupy its premises, based upon its exclusive permission to such occupancy given to another hackman.  The court, following the decision in *Griswold* v. *Webb*, say (*p.* 222) : "If the act of the defendant was such as he rightly might perform, then the exclusive grant to another is of no effect as to this defendant.  If the act of the defendant was not within his legal right, it can avail him nothing that another has been permitted to do for a consideration that which has been denied as of right to him."  The special discriminating contract was held to be immaterial in that case.

In *New York etc. R. R.* v. *Scovill*, 71 Conn. 136, it was held that a railroad company's grant of the exclusive privilege of soliciting business on the depot grounds at a station and of "plying" the business of a carrier of passengers or luggage, and forbidding others to do such acts on the grounds, if not inconsistent with the reasonable accommodation of passengers, is a reasonable provision, such as the road in the exercise of its right of ownership has the right to make.

In New York a statute provides that "no preference for the transaction of the business of a common carrier upon its cars, or in its depots or buildings, or upon its grounds, shall be granted by any railroad corporation to any one of two or more persons, associations, or corporations competing in the same business, or in the business of transporting property for themselves or others."  In *New York etc. R. R.* v. *Flynn*, 74 Hun 124, it was held that this statute does not give all the hackmen of a city the absolute right to intrude upon, or make a stand of, the premises of a railroad corporation for the purpose of soliciting business, nor does it prevent a railroad corporation, which by contract has conferred upon a transfer company the exclusive privilege of going upon its premises with hacks for the purpose of soliciting passengers, from prohibiting other hackmen, who have no contract relations with the railroad corporation or its passengers, from doing so.  This ruling was adopted in *Brown* v. *Railroad*, 75 Hun 355, and that case was

affirmed by the court of appeals in 151 N. Y. 674. The same question arose in *New York etc. R. R.* v. *Sheeley*, 27 N. Y. Supp. 185, and the same result was reached in an instructive opinion in which many of the authorities bearing upon the subject were examined, discussed, and distinguished.

In *Godbout* v. *Depot Co.*, 79 Minn. 188, the plaintiff's claim was the same as one position urged by the defendants in this case, and is stated by the court as follows: "Plaintiff, as a common carrier, has both the statutory and common-law right of entry to the Union depot, in common with other carriers accorded the privilege; but if no common carrier has the legal right of entry, defendant cannot discriminate by admitting one to special privileges and excluding others." But this contention did not obtain the approval of the court. The right to make such discrimination was held to be no infringement of the rights of passengers, to whom alone the Depot Company owed the duty of providing reasonable facilities for leaving the station upon the completion of their railroad journey. Other cases supporting this conclusion are *Barney* v. *Company*, 67 N. Y. 301; *Smith* v. *Railroad*, 149 Pa. St. 249; *Norfolk etc. R'y* v. *Baggage Co.*, 99 Va. 111; *Fluker* v. *Railroad*, 81 Ga. 461; *Kates* v. *Cab Co.*, 107 Ga. 636; *Summitt* v. *State*, 8 Lea 413; *Snyder* v. *Depot Co.*, 19 Ohio C. C. 368; *Barney* v. *The D. R. Martin*, 11 Blatch. 235; *Barker* v. *Railway*, 18 C. B. 45; *Painter* v. *Railway*, 2 C. B. N. S. 701; *Beadell* v. *Railway*, 2 C. B. N. S. 509; *Perth Committee* v. *Ross*, [1897] A. C. 479; *Pennsylvania Co.* v. *Donovan*, 116 Fed. Rep. 907; *S. C.*, 124 Fed. Rep. 1016.

From this examination of the authorities it is apparent that there is little substantial conflict of judicial opinion upon the exact question presented by the case at bar. As said by the court in the recent case last above cited, upon facts similar to those herein considered, it is "clearly established by the great weight of authority in England and the United States that complainant is entitled to the relief prayed for." That it is possible to discover general statements in some of the cases seemingly at variance with the views herein expressed is true; but the conflict thus suggested disappears in most of the cases when the facts with reference to which the statements are made are given their proper qualifying effect. It is also to be noted that there is substantial unanimity expressed in the authorities, that the right of a hackman or a job-teamster to enter a railroad station in the prosecution of his business, when it exists, is derived from, or is included in, the passenger's right as against the railroad to reasonable means of transportation for himself and baggage, and is not a right derived from any duty which the corporation owes him directly as

a connecting common carrier. If it is bound to admit him to its station under any circumstances, it is so bound only when he is employed by a passenger, and hence represents the latter as his servant or agent, or when it fails to afford the passenger reasonable facilities of egress from its grounds.

As the corporation does not claim it has the right to exclude job-teamsters employed by its passengers to bring baggage to the station for transportation on the cars or to meet them on their arrival, and as it is admitted that under its contract with Hedding its passengers will receive better service at the station with reference to opportunities for the removal of their baggage, than could be afforded by the presence there of an unnecessary number of unemployed truckmen engaged in the solicitation of passengers for the carriage of their baggage, its right to exclude the defendants from its station when there on their private business is as broad and unlimited as that of any owner of real estate to expel persons trespassing upon his premises. If its duty to its passengers is fully and satisfactorily discharged by other instrumentalities, there is no reason arising from considerations of public convenience or necessity why the additional burden should be imposed upon it, as a property owner, to furnish standing room in its station for other people to render the performance of that duty less efficient and more disagreeable to the traveling public. If the public is entitled to the best service at railroad terminals, and if it provides such service, it would be a palpable absurdity to say that it must, upon grounds of public policy, permit that service to be crippled and paralyzed by the admission to its stations of large numbers of irresponsible men clamorously seeking the privilege of performing the same service. But if its duty to its passengers does not require the presence on the arrival of trains of soliciting agents for the transfer of baggage, it is difficult to explain why it is obliged to permit others to perform that service, or why, if it makes arrangements for such unnecessary convenience of its passengers, by engaging competent men for the work, it must also furnish facilities for others to engage in the same enterprise without compensation. An onerous duty of that character can only be imposed by legislative action.

*Exception sustained.*

PARSONS, C. J., and REMICK and BINGHAM, JJ., concurred: CHASE, J., did not concur, because the questions were decided when the case was previously before the court (69 N. H. 650, and 70 N. H. 631), and he is not convinced that the decision ought to be overruled.